UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NATALIE F. LIPMAN

                       Plaintiff,

        - against -                   **COMPLAINT**

EDWARD F. RODENBACH,

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiff Natalie F. Lipman ("Lipman"), by her undersigned attorney, for her complaint in this action respectfully alleges:

### Nature of the Action

       1.     This is an action for breach of fiduciary duty; intentional infliction of emotional distress; breach of contract; tortious interference with contract; and declaratory judgment as to the effect of defendant's conduct on Lipman's rights.  Plaintiff seeks compensatory and punitive damages, attorney's fees, and declaratory and injunctive relief.

### The Parties

       2.     Plaintiff Lipman is a citizen of the State of New York, residing at 130 Coopers Farm Road, Southampton, NY 11968, in Suffolk County.

       3.     Defendant Edward F. Rodenbach ("Rodenbach") is a citizen of the State of Connecticut, and a partner in the law firm of Cummings & Lockwood in Greenwich, CT.  He is co-executor of the Estate of Paul J. Plishner ("Plishner"), and a trustee of four trusts of which Lipman is a beneficiary.

### Jurisdiction and Venue

       4.     There is complete diversity of citizenship between plaintiff and the defendant, and the amount in controversy exceeds the amount of $75,000, exclusive of interest and costs.

+The Court has jurisdiction of this action under 28 U.S.C. § 1332(a)(1).

5.      There is federal question jurisdiction in the action, in that plaintiff is seeking relief under trust agreements governed by federal law, and her claims require construction by the Court of the meaning and effect of those agreements under the Internal Revenue Code and the regulations promulgated thereunder.

6.       A substantial part of the events or omissions giving rise to plaintiff's claims occurred in this District.  Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2).

## Factual Allegations

### Background of the Case

7.      In 1975, Lipman entered into a committed romantic relationship with Paul J. Plishner.  Commencing in 1987, Lipman and Plishner resided together continuously, until Plishner's death on November 22, 2017.

8.      In the 1980s, Plishner's health began rapidly to deteriorate.  In 1987, Plishner suffered a serious stroke, and there was anticipation in the family that he might not survive. Lipman cared for him assiduously, however, and nursed him back to health.

9.      At all relevant times, Rodenbach was Plishner's lawyer.  However, in 1994, Rodenbach entered into an arrangement with Jane M. Barber ("Barber"), Plishner's eldest daughter, whereby they would jointly secure control of Plishner's finances for their mutual benefit.

10.      At the urging of Barber and Rodenbach, on May 4, 1994, Plishner established The Paul J. Plishner Living Trust ("the Living Trust"), and transferred to that trust most, or substantially all, of his assets.  The trustees of the Living Trust were Plishner, Rodenbach and Barber.  Rodenbach purported to act as Plishner's lawyer in this transaction, but in fact he was

fulfilling the arrangement he had made with Barber.  Since then, the Living Trust has been amended and restated on a number of occasions.  The final, and current, version of the Living Trust was executed on December 8, 2009.  Lipman is a beneficiary of the Living Trust, and Rodenbach owes her a fiduciary duty as a trustee of the Trust.

11.     Since it was first established, the Living Trust provided funds for the living expenses of Plishner and Lipman in New York City (a co-op apartment at 2 Fifth Avenue in Manhattan owned by Lipman) and Southampton (a house at 42 Foster Crossing owned by Plishner).

12.     In 2006, Lipman and Plishner began to live full-time in Southampton, and stopped residing in the New York City apartment.  Plishner had, through the Trust, provided the expenses of that apartment, partly because he lived there from time to time, and partly in consideration of the fact that, as alleged in paragraph 23 below, he had retained a remainder interest in that apartment in the parties' Antenuptial Agreement.

13.     In 2007, Lipman was diagnosed as suffering from Parkinson's disease.  Despite her progressive disability on account of that condition, she continued to care for Plishner and to supervise all aspects of the household.

14.     In the summer of 2007, Lipman and Plishner decided to marry.  Their marriage was opposed by Barber.  In part to appease Barber's opposition, and on the advice of Rodenbach, Plishner insisted as a condition of their marriage that Lipman enter into an antenuptial agreement ("the Antenuptial Agreement").  The Antenuptial Agreement was duly executed by its parties on August 18, 2007.

15.     Lipman and Plishner were married on August 25, 2007.  On the date of their wedding, Lipman was 70 years old and Plishner was 84 years old.

16.     Under the terms of the Antenuptial Agreement, Plishner and Lipman each retained exclusive ownership of their separate property, which was described in schedules attached to the Agreement; Lipman waived her right of election against Plishnr's Will under New York law; and Plishner provided for a lifetime annuity to Lipman.  The annuity provision came in two parts:

(a)     Under Section 2.3 of the Agreement, in the event of Plishner's "disability" (which was defined to mean a "mental impairment" determined jointly by two named physicians), Lipman was to receive an annuity of $104,000 per year until Plishner's death (if he predeceased her).  At his death, the annuity was to be increased to $150,000 per year.

(b)     If Plishner did not become disabled, and predeceased Lipman, she was to receive a lifetime annuity of $150,000 per year.  Both annuities were to be paid "from a charitable remainder annuity trust established under Section 664(d)(1) of the Internal Revenue Code."

17.     The Antenuptial Agreement further provided that any annuity payable to Lipman would be paid "quarterly in equal installments on the last day of the months of March, June, September and December with proration for any short period."

18.     On September 7, 2007, in purported fulfillment of the terms of the Antenuptial Agreement, Plishner executed a document entitled "Plishner Testamentary Charitable Remainder Annuity Trust f/b/o Natalie F. Lipman" (hereinafter, the "CRAT").  On the same date, Plishner executed two additional trust documents, entitled the "Plishner Disability Charitable Remainder Annuity Trust For Natalie F. Lipman," and the "Plishner Supplemental Charitable Remainder Annuity Trust f/b/o Natalie F. Lipman" (the "First and Second Disability Trusts"); these latter trusts were to take effect if Plishner became "disabled," as defined in the Antenuptial Agreement.

All three of these trust documents were prepared by Rodenbach, and he and Barber were named as co-trustees of each of the trusts.

19.     None of the three trusts was funded upon its creation.  Presumably, this was because all three were contingent on events that might not occur: the First Disability Trust would come into effect only if Plishner became disabled while Lipman was still alive; the Second Disability Trust would come into effect only if the First Disability Trust had come into effect, and Plishner then predeceased Lipman; and the CRAT would come into effect only if the First Disability Trust had not come into effect, and Plishner predeceased Lipman.

20.     Under the terms of the Antenuptial Agreement, any annuity trust for Lipman's benefit was to conform to the requirements of federal law, as embodied in the Internal Revenue Code and regulations thereunder.  The CRAT did not conform to federal law, as it failed to set forth in its body the actuarial assumptions upon which its funding was to be based.  In addition, the CRAT had a Schedule A attached that was supposed to set forth the property delivered by Plishner to the CRAT at its creation, but the schedule of property – though attached – was left blank.

21.     Under the Antenuptial Agreement. Lipman was entitled to proration of payments "for any short period."  Under the First Disability Trust, there was to be proration if Lipman died while receiving benefits under the Trust.  Under the Second Disability Trust and the CRAT, were Lipman to die before the last day of any three-month payment period, she would forfeit the payment for that period.

22.     Although the Disability Trusts and the CRAT purported to be for Lipman's benefit, she was not provided a copy of the documents by Rodenbach at the time they were executed.

23.     At the time of the execution of the Antenuptial Agreement, Plishner amd Lipman resided from time to time in Lipman's New York City apartment and in Plishner's Southampton house.  The Antenuptial Agreement provided Plishner with a remainder interest in Lipman's New York apartment if she predeceased him, but it provided Lipman with no property interest in any Southampton residence if he predeceased her.  However, the Living Trust provided that Lipman would own the furniture and one-half of the books (as well as certain intellectual property) in any Southampton residence if Plishner predeceased her.

24.     Notwithstanding the terms of the Antenuptial Agreement, Plishner promised Lipman on numerous occasions that, were he to predecease her, she would be permitted to reside in their Southampton residence for the remainder of her life.  Rodenbach and Barber were aware of Plishner's desires in this regard, but, pursuant to their arrangement, sought to thwart them.

25.     Lipman was a party to the Antenuptial Agreement, but she was not a party to any of the other agreements relevant to this action, including the Disability Trusts, the CRAT and the Living Trust.  She was, however, a beneficiary of all four of those trusts, and Rodenbach in his capacity of trustee owed her a fiduciary duty to administer the trusts for her benefit, and in accordance with his client Plishner's intentions.

26.     Rodenbach was not a party to the Antenuptial Agreement, and has disclaimed any obligation to enforce its terms.  However, on December 8, 2009, Plishner executed his Will, under Rodenbach's supervision, and that document expressly directed Plishner's fiduciaries (which included Rodenbach as co-executor) to comply with the Antenuptial Agreement.

27.     On December 9, 2009, Plishner executed the final amendment to the Living Trust, and Article I of that trust expressly required his trustees (including Rodenbach) to comply with the disability annuity provisions of the Antenuptial Agreement.

28.     At all relevant times, Plishner had sufficient funds and assets to maintain himself and his wife in their accustomed style for the remainder of his life.

29.     In 2009, Lipman and Plishner moved from 42 Foster Crossing to 130 Coopers Farm Road in Southampton, where Lipman currently resides (the "Southampton Residence").  At the time of this move, Barber promised Lipman's son, Andrew Lipman, unbidden, that if Plishner were to predecease her, Lipman would be permitted to reside in the Southampton Residence for the rest of her life.  Barber was then the designated co-executor of Plishner's Will, and a co-trustee of all four of the trusts.

30.     In or about 2012, as Plishner's and Lipman's health deteriorated, Rodenbach embarked upon a plan, using his powers as trustee of the Living Trust, to constrain Plishner's spending, and his generosity to his family, so as to maximize the assets that would become available to Barber upon her father's death, and subject to his control as trustee.

31.     On April 23, 2012, Rodenbach informed Plishner and Lipman by letter that he and Barber had decided no longer to pay the upkeep of the New York City apartment.  Plishner had not been consulted about, nor did he consent to, this new arrangement.  Lipman would not have objected if Plishner simultaneously had relinquished his remainder interest in the apartment, which would have left Lipman free to give the apartment, if she wished, to her only son and heir, Andrew, who lives and works in New York City.  Because of her husband's remainder interest, she felt she could not do so; and in the circumstances, she regarded the cutoff of support for the New York apartment as a unilateral breach of the understandings reached when the Antenuptial Agreement was entered into.

32.     Under the Antenuptial Agreement, the fine art in the couple's homes was the separate property of Lipman.  Notwithstanding this provision, Rodenbach alleged in 2012 that

Plishner had insufficient funds to support them, and induced Lipman to sell some of her art and contribute the funds to their upkeep.  The claim that Plishner's funds were insufficient to support them for what was then likely to be his short remaining lifetime was false, and was made in furtherance of Rodenbach's arrangement with Barber to conserve as much as possible of her father's assets for her own benefit.

**The Breach of the Disability Provision of the Antenuptial Agreement**

33.     As alleged in paragraph 8 above, in 1987 Plishner suffered a stroke.  This left him with some continuing neurological deficit.

34.     Between 2007 and the date of his death, Plishner suffered progressive mental impairment:

(a)     The first such symptoms appeared as early as 2007, and resulted in Plishner adding the disability clause to the Antenuptial Agreement.

(b)     In or about 2013, Plishner was admitted to Southampton Hospital on account of his dementia.  He was formally diagnosed at that time by one of his regular neurologists as having dementia with Lewy bodies.  This is a neurological disease characterized by gradual and progressive loss of intellectual abilities combined with a movement disorder that resembles Parkinson's disease.

(c)     Thereafter, Plishner had marked fluctuations in his ability to stay alert and awake, and also had visual hallucinations.  His mental impairment progressively worsened until the date of his death.

(d)     Rodenbach was aware of the foregoing facts.

8

35.     Plishner's dementia made it much more difficult for Lipman to care for him, but she continued to do so with great care and effectiveness, with the assistance of trained caregivers.

36.     As Plishner's dementia progressed, he became rapidly more disabled.  At some point it became manifest that Plishner suffered from a "mental impairment" within the meaning of the Antenuptial Agreement.  Rodenbach was then effectively in control of Plishner's financial affairs, and it was incumbent upon him as trustee of the Living Trust, and as Lipman's fiduciary, to consult with the physicians named in the Antenuptial Agreement and have it confirmed that the disability clause of that Agreement had been triggered.  Rodenbach failed to do so, because he did not wish Lipman to receive the $104,000 annuity to which she would then have become entitled.  In depriving Lipman of this annuity, Rodenbach committed a breach of his ethical duty as attorney for Plishner, a breach of his fiduciary duty to Plishner and Lipman, a breach of the terms of the Antenuptial Agreement, and/or an act of tortious interference with the Antenuptial Agreement.

37.     Article I of the Living Trust provides in part that "Section 2.3 of the Antenuptial Agreement requires me to fund a charitable remainder trust for NATALIE in the event of my disability (as defined in the Antenuptial Agreement), and I hereby direct my Trustees to comply with this requirement in the Antenuptial Agreement."  This provision required Rodenbach to fund the First Disability Trust when Plishner first developed a mental impairment.  By failing to comply with this provision, Rodenbach breached his fiduciary duties to Plishner and Lipman.

38.     Upon Plishner's becoming disabled within the meaning of the Antenuptial Agreement, Rodenbach was obliged to fund the First Disability Trust and put it into effect.  At the same time, the CRAT became a nullity, and should have been discarded.

**Lipman's Retention of Counsel**

39.     In April 2013, when it seemed likely that Plishner's life might be approaching its end, and as her own physical condition continued to deteriorate, Lipman retained counsel to protect her interests in the event of her death or the death of her husband. The counsel she retained was Francis Carling ("Carling"), a New York City lawyer who was an old family friend. Carling informed Rodenbach by email of his retention, and in the following weeks exchanged emails with Rodenbach, received letters from him, and spoke with him by telephone on at least two occasions.

40.     The gist of Carling's message to Rodenbach was that Lipman hoped that, in the event of her husband's death, the promises that she would remain in the Southampton Residence for the remainder of her life would be honored. At that time, the Southampton Residence was fully adapted to Lipman's and Plishner's physical disabilities, whereas the New York City apartment was – and is – not. Rodenbach neither confirmed nor denied that the promises had been made, but he expressed the view that the Southampton Residence was a larger house than Lipman would need if she was living without her husband. Carling suggested that a reasonable solution might be, if Plishner died, for the Living Trust to sell the Southampton Residence and purchase a smaller house in the village for Lipman. Rodenbach did not say that that would be impossible or inappropriate, but he did say that it was premature to be discussing these contingencies when it was uncertain which of Plishner or Lipman would survive the other. Carling accepted this, and the lawyers agreed to put off further discussions until developments rendered such discussions necessary.

41.     It was clear in these communications, and made manifest by later events and communications, that Rodenbach had – and has – a deep-seated animus for Lipman, based in

part on sexist assumptions.  He has always regarded her as a sort of "gold digger" who was after Plishner's money, even though Plishner and Lipman were a devoted couple for some 40 years, and Lipman was a successful businesswoman with substantial assets of her own.  This animus precludes him, in her view, from continuing to serve as her fiduciary under any of the trusts.

42.    When it became apparent that Plishner was suffering progressive mental impairment, and that the First Disability Trust should be funded, Rodenbach took it upon himself to ignore Plishner's directions and Lipman's rights under that Trust, and to take no action to investigate Plishner's condition or to fund the Trust.  In an extraordinary breach of his ethical duty to Plishner as his lawyer, he decided not to call the physicians named in the Antenuptial Agreement to confirm Plishner's disability, but simply to sweep the issue under the rug, where it remained until after Plishner's death.

43.    Except for an exchange of emails with Rodenbach concerning some of Plishner's actions attributable to his dementia, Carling had no further occasion to communicate with Rodenbach until November 2017.  In the interim he visited with Lipman from time to time in Southampton and stayed in touch with her by phone.  At no time did Rodenbach communicate with Carling to ascertain if there had been any change in his attorney-client relationship with Lipman.  At no time did Rodenbach consult with Carling about Plishner's deteriorating condition, or disclose to him that Lipman was entitled to a disability annuity from Plishner under the Living Trust and the First Disability Trust.

44.    In April 2013, in accordance with his arrangement with Barber described above, Rodenbach induced Plishner to transfer to Barber his farm in Roxbury, Connecticut, an asset valued in the Antenuptial Agreement at some $2 million.  At the time of this transfer, Plishner was not mentally competent to approve it, or to understand its implications for his intentions

toward Lipman.  The effect of the transfer was to dramatically reduce the assets in the Living Trust, thus making it uncertain whether that Trust could fund the Disability Trusts or the CRAT without first selling the Southampton Residence.  Rodenbach intended this transaction to create a *fait accompli* that might nullify Plishner's wish that Lipman could remain in their home after his death.

45.     In or about 2016, Barber, with Rodenbach's assent, began to insist that Plishner be transferred to a nursing home in Connecticut.  On information and belief, Barber's goal was to impair the relationship between Lipman and Plishner: Lipman's weakening physical condition would as a practical matter have made it impossible for her to visit Plishner in a nursing home so far from her residence.  Lipman refused this demand, since she wanted to remain with her husband, and because she believed that his life would be shortened if he were removed from his home, taken away from his companion of 40 years, and put into the care of strangers.

46.     In October 2017, Plishner told Lipman that he regretted not making it explicit in the Antenuptial Agreement that she would be permitted to remain in the Southampton Residence for her lifetime if he predeceased her.

**Plishner's Death, and Rodenbach's Scheme to Further Harm Lipman**

47.     On November 22, 2017, Plishner died peacefully in his sleep, in the company of his wife, at the Southampton Residence.

48.     On information and belief, Rodenbach immediately put into motion a plan to oust Lipman from her home, and to so terrorize and demoralize her that she would be unable to resist his efforts or seek to enforce the promises that had been made to her.

49.     For his plan to succeed, Rodenbach had to keep Carling out of the picture for as long as possible.  He therefore decided that he would write directly to Lipman, bypassing her

counsel, with threats so severe as to wholly demoralize and thus weaken her, and to compromise her health so completely that she would not have the strength to resist him.

50.     Rodenbach put his scheme into action by writing directly to Lipman on November 28, 2017 – a mere *six days* after her beloved companion of 40 years had died in her presence – in such harsh terms as to bring about her swift collapse.  The gist of Rodenbach's message in this letter (the "November 28th Letter"), in pertinent part, was as follows:

(a)     He announced that he was terminating all payments for Lipman's upkeep and support, including the cost of her caretakers, effective January 1, 2018.

(b)     He informed Lipman that she was due to receive an annual annuity of $150,000, but stated that "the first check may not be issued until the settlement of Paul's estate is complete.  That is expected to take at least two years."  While IRS regulations may have given him some discretion to delay the funding of the CRAT in this fashion, there was no reasonable basis for doing so in this instance, and it was a breach of his fiduciary duty to threaten Lipman that he might exercise his discretion against her interests in that manner.  At any rate, the CRAT was a nullity at this time, as the two Disability Trusts had taken effect.

(c)     He told Lipman that "you will need to relocate to the apartment in New York City, as soon as you can arrange it, but not before the holidays."  He said she would be obliged to pay the normal expenses of a "tenant" in the house while she remained there, but he confirmed that she would not be required to pay rent, and that Plishner's Estate would pay the real estate taxes on the house, as well as the cost of all or most of the homeowner's insurance.

(d)     He told Lipman that "you should leave Paul's furniture … in the house when you leave."

51.     The arrival of this letter by FedEx so soon after Plishner's death (and the very day after a hearse containing Plishner's ashes stopped at the Southampton Residence so that Lipman could have a final moment with him), and behind the back of her lawyer, had a devastating effect on Lipman's health and emotional well-being.  Lipman believes that this was Rodenbach's intention in sending the letter in that manner.  Since Lipman received the letter, her health and emotional well-being have continued to decline, and in 2018 she lost the ability to walk. Rodenbach has been advised of Lipman's condition on numerous occasions by Carling, but has expressed no interest in, or curiosity about, her health.

52.     The November 28th Letter was not only intended to, but did harm Lipman, and it is full of inaccuracies that heightened its deleterious effects.

53.     Rodenbach's threat to withhold annuity payments for at least two years was a callous attempt to starve Lipman into submission.  Plishner's Estate has no substantial assets, and it is not clear why his Will even needed to be submitted to probate.  More importantly, the obligation to pay the annuity was an obligation of the Living Trust and the other trusts, not of the Estate, and the Living Trust had ample assets to meet that obligation.  Thus, withholding annuity payments until probate proceedings were completed would have been unnecessary, and needlessly cruel.

54.     Rodenbach's demand that Lipman relocate to the New York City apartment ignored the promises made by Plishner and Barber that Lipman could remain in the Southampton Residence for the remainder of her life.  In his interactions with Carling thereafter, Rodenbach never denied that those promises were made.  Carling assumed that Rodenbach's position was that the promises were legally unenforceable, but Rodenbach has never even said as much.

55.     The demand that Lipman relocate to the New York City apartment also ignored the fact that that apartment would require extensive renovation to become accessible to Lipman due to her disability, which confines her to a wheelchair; and it further ignored the likely deleterious effect on Lipman's health and emotional well-being that would result from her moving from the peace and tranquility of the Village of Southampton, where she had now resided for many years, to New York City.

56.     Article II, Section C.4. of the Living Trust provides that "My trustees shall distribute to NATALIE F. LIPMAN, if she survives me, the furniture located in any home that I may own at the time of my death in Southampton, New York."  Thus, Rodenbach's assertion that some or all of that furniture belonged to Plishner after his death was unwarranted, and constituted a breach of his fiduciary duty to Lipman.

57.     Rodenbach's sending the November 28th Letter directly to Lipman, rather than to the lawyer who he knew had been retained expressly to deal with the contingency of Plishner's death, was a breach of his ethical obligations as a lawyer, as codified in Rule 4.2(a) of New York's Rules of Professional Conduct for lawyers, and similar rules governing the conduct of Connecticut lawyers.

58.     Shortly after November 28th, Rodenbach told Carling that he was justified in sending the letter because he did not know if Carling was still Lipman's counsel in 2017 (which a simple phone call could have confirmed).  Since then, he has insisted on his "right" to communicate directly with Lipman in his capacity as a trustee, notwithstanding that he is a senior partner in a prominent law firm, that he knows Lipman is represented by counsel, and that he and Lipman have adverse interests.  These shifting explanations for his dealing directly with Lipman evidence Rodenbach's bad faith.

59.     Rodenbach's making false statements in the November 28th Letter, and in subsequent communications with Lipman's counsel (directly, or through an agent), was a breach of his ethical obligation not to knowingly make false statements of fact or law to a third person, as codified in Rule 4.1 of New York's Rules of Professional Conduct for lawyers, and similar rules governing the conduct of Connecticut lawyers.

**Subsequent Dealings Between Counsel for the Parties**

60.     On November 29, 2017, immediately upon learning of the November 28th Letter, Carling called Rodenbach to protest his communicating with Lipman rather than her counsel.  He told Rodenbach that Lipman's receipt of his letter had had a devastating effect on her emotionally and physically.  In that call, and in subsequent communications in writing and by phone between them, Rodenbach never expressed any interest in Lipman's health or well-being, nor did he ever inquire of Carling about those subjects.  In an email message of March 7, 2018, Rodenbach told Carling that Barber had no "obligation to spend the estate's (Jane's) money or time attempting to find a solution to [Natalie's] situation or making her life easier," and that it was not Barber's "obligation to lift a finger in this regard."

61.     In fact, the money in issue was Plishner's, not Barber's, but Rodenbach's assertion was consistent with his viewpoint that it was to Barber that he owed duties, not Plishner or Lipman.

62.     The contacts between Carling and Rodenbach in 2017 concluded with a telephone call on December 14th.  In that call, Carling made a concrete proposal: that Lipman be permitted to remain in the Southampton Residence for another five years (rather than for her lifetime, as had been promised), and that she would commence to pay all the expenses of the house effective January 1, 2018.  Rodenbach did not reject the proposal out of hand but said that five years might

be too long; that perhaps Lipman should pay rent; and that, if the proposal were accepted, there would have to be some firm guarantee that Lipman would move out at the end of the agreed term.  He promised to give Lipman's proposal due consideration and said he would get back to Carling with a response.

63.     Rodenbach never spoke by telephone with Carling again until April 12, 2018, though Carling requested that he call him.  He did not respond to Lipman's December 14th proposal until March 7, 2018, when he rejected the proposal by email, and made no counterproposal (as Carling had assumed that he would).

64.     In late February 2017, in a telephone call with Barber, Lipman said she was constantly reminded of her beloved husband by the presence of his things in their bedroom. Barber responded that she thought Lipman should discard the twin beds in that room, purchase a larger bed for herself, and have the room repainted.  Barber at that time was a trustee of the Living Trust and co-executor of Plishner's Will, and Lipman reasonably interpreted those comments as indicating Barber's expectation and consent that Lipman would remain in the house for at least some period, if not for her lifetime.

65.     Between December 14, 2017 and March 7, 2018, in a series of email communications, Rodenbach or his partner Daniel P. Fitzgerald ("Fitzgerald"), continued to exert pressure on Lipman by making, among others, the following false claims and threats:

(a)     Near the end of February, Carling suggested in a telephone conversation with Fitzgerald that it might be a good idea for Barber and Lipman, in their communications with each other, to avoid discussing the legal issues that were being dealt with through their lawyers. On March 1, 2018, Fitzgerald sent an email to Carling misrepresenting that he had requested that *all* communications between Barber and Lipman cease; falsely claiming that Lipman and her son

Andrew had been calling Barber "directly and repeatedly;" and advising that there should be no further communications between Barber, on the one hand, and Lipman and Andrew on the other. Until this point, and for decades, there had been close, familial relations between those parties, and regular and routine communication.  Fitzgerald, acting on Rodenbach's behalf, now decreed that these family relations should end.  This was intended to inflict emotional distress on Lipman, by impairing or destroying the relations between her family and the Plishner family.

(b)      In an email sent on February 26th, Fitzgerald stated that the annuity payments due to Lipman would not commence until she vacated the Southampton Residence. When Carling responded that failure to pay the annuity would breach the relevant agreements, Fitzgerald asserted that Lipman had breached the Antenuptial Agreement by remaining in the house after Plishner's death.  This was a false statement of fact and law.

(c)      On February 28th, Fitzgerald threatened to commence eviction proceedings against Lipman, who was still awaiting a response from Rodenbach to her proposal of December 14th, and who had been paying the expenses of the Southampton Residence since January 1, 2018 in good faith conformity with that proposal.

(d)      On March 9th, Rodenbach sent Carling an email in which he claimed, speaking for himself and Barber, that "we have not consented to [Lipman] staying in the house even for a day."  This claim was contradicted by Rodenbach's own November 28th letter, which consented to Lipman's remaining in the house through the holiday season.  Rodenbach also implied that eviction proceedings might be commenced without further warning.

66.      These needlessly aggressive threats by Rodenbach and his agent were meant to terrorize Lipman, to retaliate against her for trying to remain in the Southampton Residence in

accordance with Plishner's wishes and Barber's promise, and to cause her emotional distress so that she would bend to Rodenbach's will.

67.    Rodenbach, though Lipman's fiduciary, was utterly indifferent to the effect that his strong-arm tactics were having on Lipman's health, which he knew was very fragile.  Were her health to be compromised further by the stress he inflicted upon her, or even if she were to die prematurely, that would have served Rodenbach's interest in minimizing his financial obligations to her under the trusts, and maximizing the amount of Plishner funds he would control after her death.

68.    As weeks and weeks passed after December 14, 2017, Lipman became more and more anxious due to the lack of a response from Rodenbach to her proposal.  Carling tried to reassure her that "the ball was in Rodenbach's court," as it were, and that the lack of a quick rejection of her proposal gave cause for optimism that a constructive counterproposal would be forthcoming.  On information and belief, Rodenbach's delay in responding was in fact a deliberate strategy calculated to wear Lipman down, to increase her emotional distress and uncertainty, and to make her more amenable to complying with Rodenbach's wishes.

69.    When February arrived, with no counter-offer from Rodenbach and with the threat of her losing her home looming, Lipman reached such depths of despair that she began to consider taking her own life.  Carling was only able to dissuade her from considering such action by promising that he would somehow find a way to protect her from Rodenbach's aggressions.

70.    In the March 9, 2018 email from Rodenbach to Carling referred to in paragraph 65(d) above, Rodenbach suggested that he might take legal action to remove Lipman from the Southampton Residence.  Carling responded on March 13th:

> Ed, I can't forward this [email] to Natalie; I've never uttered the word "eviction" to her, and I think it would devastate her if I did.  And I also

> think that, if you were actually to launch proceedings against her without
> warning and a chance for me to prepare her and calm her down, it might
> literally prove fatal to her in her current condition.

Rodenbach assured Carling by return email that no eviction proceeding would be commenced

without warning to him.  It was also arranged that any eviction papers would be served on

Lipman's Southampton counsel, and not on her directly.

71.    Carling then notified Rodenbach that Lipman would attempt to raise the necessary

funds so that she could purchase the Southampton Residence herself, thus resolving what were

then thought to be the issues between the parties.  Lipman proceeded to try to do so.  She also

began searching diligently for other housing in Southampton.  However, it soon became clear

that Rodenbach's decision to withhold the annuity payments from Lipman to force her to leave

her home was self-defeating.

72.    Rodenbach's justification for withholding the annuity payments from Lipman was

that she was in "breach" of her obligations by not vacating her home.  However, the only

agreement to which she was a party was the Antenuptial Agreement, and although that document

confirmed that the Southampton Residence was Plishner's property, it nowhere set a deadline for

her to vacate the property.  Indeed, as alleged in paragraphs 24 and 46 above, Plishner had

promised her that she could remain in the house after his death.

73.    At all relevant times after Plishner's death, Lipman, through her counsel, was

engaged in good-faith negotiations with Rodenbach on terms under which she might remain in

the Southampton Residence, either by way of accommodation to Plishner's wishes, as a tenant,

or as a purchaser.  A premise of those negotiations was that Lipman would remain in the house

until the negotiations were concluded.  Thus, Rodenbach's claim that Lipman committed some

sort of breach by remaining in the house was false and unfounded, and he breached his fiduciary duty to Lipman by asserting the claim.

74.     On April 9, 2018, Rodenbach sent notice to Carling by way of email that a New York lawyer had been retained to commence eviction proceedings against Lipman.  In accordance with his March 13th email to Rodenbach, Carling did not forward this message to Lipman.

75.     Within minutes of Carling's receipt of the April 9th notice, Barber took it upon herself to forward that message to Lipman, bypassing the lawyers who were trying to reach a solution on behalf of the parties.  She did this to intimidate Lipman and inflict maximum emotional distress upon her.  In this, she was successful.  If Rodenbach authorized this action, he committed a breach of legal ethics and of his fiduciary duty to Lipman.

76.     Lipman owns fine art with substantial value, which she keeps in her New York apartment.  Under the Antenuptial Agreement, the art was her exclusive property.  As alleged in paragraph 32 above, Rodenbach had once pressured her into selling some of that art and contributing the proceeds to the upkeep of her household with Plishner.  After Plishner's death, Lipman became concerned that Rodenbach or Barber might make a claim for her art on behalf of Plishner's Estate.  At the same time, she determined that she had to begin to sell off the art works in order to raise funds to acquire housing in Southampton.  She succeeded in selling one painting, by Rufino Tamayo, to Marlborough Gallery for $520,000.

77.     Carling informed Rodenbach of this sale in a telephone call, in order to demonstrate Lipman's good faith efforts in raising funds to purchase the Southampton Residence, and to gain Rodenbach's assurance that the Plishner Estate would make no claim to the proceeds.  Rodenbach declined to give any such assurance, saying that he preferred to keep

the possibility of such a claim as a bargaining chip in the ongoing negotiations. This response was intended to cause anxiety and emotional distress to Lipman, and it was entirely unjustified in view of the plain terms of the Antenuptial Agreement. In threatening that he might try to take Lipman's fine art away from her, Rodenbach breached his fiduciary to her, and breached and/or tortiously interfered with the Antenuptial Agreement.

78.     The reason ultimately given by Rodenbach for not permitting Lipman to remain in the Southampton Residence was that the CRAT, which he represented was to be the source of Lipman's annuity payments, could not be funded in part by transfer to it of ownership of the Southampton Residence, but had to be funded in cash or marketable securities. Rodenbach claimed that there were not enough liquid assets in the Living Trust to fund the annuity payments through the CRAT. Thus, according to Rodenbach, he was required by law to sell the Southampton Residence. However, had Rodenbach not transferred the Roxbury property to Barber, as alleged in paragraph 44 above, there would have been ample funds in the Living Trust to fund the CRAT without selling the Southampton Residence.

79.     Rodenbach also asserted that, once the CRAT was funded, Lipman could not remain in the Southampton Residence because that would violate the self-dealing rules applicable to charitable remainder trusts. This implied that the Southampton Residence belonged to the CRAT, but in fact it belonged to the Living Trust. Thus, as long as the CRAT was fully funded, and the Southampton Residence remained in the ownership of the Living Trust, the IRS rules against self-dealing would not apply, and Lipman could have remained in the house.

80.     At no time after Plishner's death did the Living Trust offer the Southampton Residence for sale or attempt to find a buyer for the property other than Lipman. Had the Living Trust entered into a contract of sale with a third-party buyer, Lipman was fully prepared to find

alternative housing in Southampton, and she would have vacated the Southampton Residence before the closing of the sale. This would have been readily accomplished if Rodenbach had ceased his breaches of the relevant agreements by making the required annuity payments to her. As long as Lipman vacated the house before the closing of a sale, it could not have been maintained that she was not in full compliance with the terms of the Antenuptial Agreement.

**The Barber Action**

81.     As alleged in paragraphs 62 and 63 above, Rodenbach dragged his feet in the negotiations with Lipman for her renting or buying the house. As alleged in paragraph 74 above, Rodenbach ramped up the pressure on Lipman by engaging counsel to bring an eviction action against her. These actions threatened to bring about a complete collapse of Lipman's health, and indeed were so intended by Rodenbach.

82.     When Carling had queried Rodenbach in the course of their dealings why he was treating Lipman so harshly, he responded that he had a client with whose wishes he must comply. Rodenbach was referring to Barber. At all relevant times, Rodenbach subordinated his duty to Plishner and Lipman to his duty to Barber, pursuant to the arrangement alleged in paragraph 9 above.

83.     Lipman determined that the only way she could regain any peace of mind in the face of Rodenbach's onslaught was to bring a legal action to protect her rights, and to block the effort to evict her from her home. Accordingly, on April 23, 2018, she filed an action in this Court against Barber (*Lipman v. Barber*, 18cv2390(ADS)(GRB)) (the "Barber Action"). Barber was chosen as the defendant because Rodenbach had implied to Carling that she was the driving force behind his actions.

84.     Barber in due course filed an answer and counterclaims (Docket No. 6).  In her sixth counterclaim, Barber alleged upon information and belief that Lipman had sold a painting by Fernando Bolero to Marlborough Gallery for $520,000, and that that painting belonged to the Plishner Estate.  Rodenbach was the source of Barber's "information and belief" (though he got the name of the artist wrong).  In fact, the painting in question was among the separate property of Lipman referenced in the Antenuptial Agreement, and there was no good-faith basis for Barber's claim.  As co-executor and heir of his Estate, Barber stood in Plishner's shoes for purposes of enforcement of the Antenuptial Agreement, and by bringing the claim for Lipman's art Barber breached the Antenuptial Agreement.

85.     Article II of Plishner's Will specifically directed his fiduciaries to comply with the Antenuptial Agreement.  Article VI(B) provided that anyone who sought "to prevent the execution of any of [the] terms" of the Will would effectively be disinherited.

86.     Section 5.17 of the Antenuptial Agreement provided that any party found to have breached the terms of that Agreement would be liable for the reasonable attorney's fees of the party injured by the breach.

87.     Rodenbach counselled Barber to sue for the proceeds of Lipman's sale of art solely to cause Lipman emotional distress, and to demonstrate his hostility to, and power over, her.  In so doing, he breached his duty to Barber, by needlessly exposing her to the risk that she would be disinherited under Plishner's Will; and he breached his fiduciary duty to Lipman.

88.     Notwithstanding her filing of the Barber Action, Lipman continued her diligent search for another home in Southampton.  She determined that the most she could afford to pay was $1.6 million, and that she would need a mortgage to purchase a home at that price.  She did find a suitable residence priced at $1.6 million, and put in a formal bid at the asking price; but it

soon became apparent that it would be impossible to obtain a mortgage while Rodenbach remained in breach of his obligation to pay her annuity.

89.     At some point after the Barber Action was filed, Rodenbach confided to Carling that he had not read the pleadings in that action.  Given his status as a co-executor and co-trustee with Barber, it was a breach of his fiduciary duty to Lipman not to inform himself as to the allegations in that action.

**The Settlement of the Suit and Subsequent Events**

90.     On June 27, 2018, the parties to the Barber Action, by their counsel, appeared at an initial conference before Magistrate Judge Gary R. Brown.  The conference very quickly became a settlement conference.

91.     Through Judge Brown's diligent and skillful efforts, a complete settlement of the action was reached.  Essentially, in exchange for Barber's agreeing (presumably on behalf of the Living Trust) to sell the Southampton Residence to Lipman for $2.3 million, Lipman agreed to drop her claims against Barber.  The premise of the settlement was that the house was worth at least $2.75 million, which was the amount at which it had been appraised for purposes of Plishner's Estate.  A subsequent appraisal by an independent bank gave the value of the house at only $2.3 million, however, so it is not clear to what extent Lipman benefitted from the settlement.  However, she did succeed in ending Rodenbach's threats to have her evicted, which were destroying her health and well-being, and to that extent the settlement achieved Lipman's principal goal.

92.     In all his prior dealings with Carling, Rodenbach had contended that the relevant trust was the CRAT.  Since Plishner had become seriously impaired mentally years before he

died, this was a misrepresentation of fact: it was the Disability Trusts that were controlling, not the CRAT.

93.     Rodenbach, through his counsel, failed to disclose to the Court at the conference that the controlling trusts were the Disability Trusts, or that Lipman was entitled to past due annuity payments from those trusts.

94.     The settlement provided that Lipman would close on the sale of the house on or before October 1, 2018.  Lipman and the Living Trust duly entered into a contract of sale that required Lipman to pay a deposit of $230,000, and to close on or before that date.

95.     As the summer progressed, however, it became clear that no bank would give Lipman a mortgage while she was not receiving her annuity, which was meant to be the major portion of her income.  Rodenbach was duly informed of this, and eventually he relented and agreed to start making payments on the annuity.  The parties also agreed to extend the closing date until on or before November 1st .

96.     Notwithstanding these concessions, all three of the banks to which Lipman applied for a mortgage on the Southampton Residence denied her application.  She then proceeded to apply for a mortgage on her New York apartment; but because that apartment was a co-op, various approvals were required, and it was necessary to extend the closing date still further.  The Living Trust agreed to a further extension, but demanded that Lipman pay it $300 per day for each day after November 1st before the closing occurred.  Lipman bowed to this demand under duress, since to fail to agree would have meant that the Living Trust could cancel the sale and keep her $230,000 deposit.

97.     The sale finally closed on November 19, 2018, and the Southampton Residence now belongs to Lipman.

98.     As part of the purchase, Lipman was required to pay $5,700 to the Living Trust in "per diem rent."  Rodenbach's counsel later admitted that the $300 per diem fee was intended as a "penalty."  At the time, the Living Trust had $2 million in liquid assets, and it did not need these funds nearly as much as Lipman did.  Moreover, her delay in meeting the closing deadline was caused by Rodenbach's continued withholding of the annuity payments to which she was entitled, and therefore that delay did not deserve to be penalized.  The imposition of this penalty was meant to humiliate Lipman, and to demonstrate once again Rodenbach's power over her, and his disdain for her.

99.     Rodenbach had one final insult in store for Lipman.  In his November 28, 2017 letter referred to in paragraph 50 above, Rodenbach had confirmed that Plishner's Estate (by which he may have meant the Living Trust) would pay "insurance on the house but only for the contents owned by Paul."  After the Barber Action was settled, Carling discovered that Lipman had been making the required payments on the homeowner's insurance policy.  He asked Rodenbach to reimburse her for these expenses, and Rodenbach first responded that he would "consider" doing so, and later that he was "working up the numbers."  Presumably, this meant adjusting the insurance bills to exclude any property covered that belonged to Lipman rather than to Plishner.

100.    When no reimbursement was forthcoming from Rodenbach, Carling made a calculation himself, and suggested a few days before the closing that the closing payments be adjusted by giving Lipman credit for the insurance payments she had made, less the amount of those payments attributable to the contents of the house.  To do otherwise, he suggested, would be in effect to be charging Lipman rent for the house, in violation of the terms of the settlement.  Rodenbach, through his counsel, then declared that the Living Trust was not a party to the Barber

Action; that it was not bound by the settlement; and that the reimbursement would not be made. This act of gratuitous cruelty confirmed Rodenbach's animus towards Lipman, and breached his fiduciary duty to her.

### FIRST CLAIM FOR RELIEF
### (BREACH OF FIDUCIARY DUTY UNDER THE
### LIVING TRUST AND THE DISABILITY TRUSTS)

101.    Lipman repeats the allegations in paragraphs 6-100 above as though fully set forth herein.

102.    Plishner included the disability provision in the Antenuptial Agreement because, as of the time of its execution in 2007, he already was concerned that he might be beginning to suffer from some degree of mental impairment.  He had the Disability Trusts prepared and executed out of the same concern.  On information and belief, Rodenbach was well aware of Plishner's concerns in this regard.

103.    When the Living Trust was last amended in 2009, Plishner specifically directed his trustees to enforce the disability provision in the Antenuptial Agreement.  At this time, Plishner's symptoms of mental impairment had increased, and Dr. Jeffrey Nelson had retired; and Plishner sought treatment from other neurologists.  Rodenbach was aware of these facts.

104.    As alleged in paragraph 38 above, when Rodenbach became aware that Plishner might be experiencing progressive mental impairment, he was obliged by the terms of the Living Trust to effectuate the terms of the Antenuptial Agreement.  That would require him to confer with Drs. Nelson and Kloth to confirm whether, in their opinion, Plishner was indeed suffering from a mental impairment and, if so, when the impairment commenced.  Upon such confirmation, Rodenbach was required immediately to fund the First Disability Trust from the Living Trust, and to commence annual payments of $104,000 to Lipman.

105.    The idea of spending any of Plishner's money on his wife has always been disagreeable to Rodenbach.  Accordingly, he decided that he could avoid the disability clauses in the Antenuptial Agreement and the Living Trust simply by failing to confer with Drs. Nelson and Kloth (whose telephone numbers were set forth in the Antenuptial Agreement precisely to make such consultation easy for him).

106.    In 2017, before Carling had had an opportunity to study the texts of the various trust agreements in detail, Rodenbach mentioned casually to him that the Disability Trusts were irrelevant because the doctors in question had never "certified" Plishner's impairment.  In fact, the word "certified" did not appear in the Antenuptial Agreement, and Rodenbach's implication that the doctors had been consulted and had declined to confirm that Plishner suffered from a mental impairment was false.

107.    A few weeks before the closing of the sale of the Southampton Residence, Carling was informed by counsel that Rodenbach would no longer deal with him directly, but would deal only through counsel, the expense of whom he would charge to one or another of the trusts.

108.    On January 24, 2018, having had an opportunity to look into the matter further, Carling asked Rodenbach, through his counsel, why Plishner had never been declared disabled, and whether Rodenbach had ever consulted Drs. Nelson and Kloth on that subject.  Through his counsel, Rodenbach replied that "the prenuptial agreement was an agreement between Mr. Plishner and Ms. Lipman.  Mr. Rodenbach had no obligation to Ms. Lipman under Section 2.4 or any other provision of this agreement."  In view of the plain language of Plishner's Will and Article I of the Living Trust, this claim was false.  A jury should be permitted to infer from this response that Rodenbach's breach of his duties was willful, and that he made no attempt to meet his fiduciary duty by conferring with the named physicians.

109.    Although there remains a question of fact as to precisely when Plishner became mentally impaired, in the final years of his life he exhibited extreme and obvious symptoms of dementia, with wild fantasies and actions a daily part of his life.  Some of these events required Rodenbach's intervention, and he was perfectly well aware of Plishner's rapidly deteriorating condition.  Yet, at no time did he consider consulting the physicians named in the Antenuptial Agreement, or funding the First Disability Trust.  This was a gross breach of his fiduciary duties warranting both compensatory and punitive damages.

110.    Under New York law, fiduciary duty requires "not honesty alone, but the punctilio of an honor the most sensitive…" *Meinhard v. Salman*, 249 NY 458 (1928).  Rodenbach's conduct with respect to the Disability Trusts was not just a breach of the plain terms of the applicable trust agreements, but dishonorable in the extreme: he took it upon himself to deprive Lipman of the disability annuity benefits to which she was unquestionably entitled simply because he thought she should not have the money.  In doing so, he flouted the wishes and directions of his own client, Plishner, and breached his fiduciary duty to Lipman.

111.    On this claim, Lipman is entitled to a judgment in her favor as follows:

(a)     a finding, at trial, of the date on which Plishner became mentally impaired within the meaning of the Antenuptial Agreement;

(b)     a judgment against Rodenbach personally for compensatory damages, at the rate of $104,000 per year from the date of Plishner's disability until the date of his death, together with interest;

(c)     an award of punitive damages in an amount to be fixed by the jury;

(d)     an order barring Rodenbach from charging any damages awarded and any of his attorney's fees to any of the Plishner trusts; and

(e)      an order removing Rodenbach as trustee of all of the Plishner trusts and as co-executor of Plishner's Estate, and appointing in his place a fiduciary selected by the Court who will protect Lipman's interests.

112.    In the event that the jury should find that Rodenbach's breach of the relevant agreements was not intentional and was done in good faith, Lipman is entitled in the alternative to an order requiring that Rodenbach as trustee of the CRAT transfer the funds in that trust to the Disability Trusts, and if those funds are not sufficient fully to fund those trusts, that Rodenbach be directed as trustee of the Living Trust to transfer such additional funds from that trust so as to render the Disability Trusts fully funded.

113.    Lipman is further entitled to a judgment against Rodenbach for her reasonable attorney's fees pursuant to Article V, Section 5.17 of the Antenuptial Agreement.

## SECOND CLAIM FOR RELIEF
## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

114.    Lipman repeats the allegations in paragraphs 6-113 above as though fully set forth herein.

115.    By his conduct, and the conduct of his agents, described above, Rodenbach intended to inflict, and succeeded in inflicting, intense emotional distress on plaintiff, commencing on November 28, 2017, and continuing through the date of the filing of this action and thereafter.

116.    Lipman is entitled to an award of compensatory and punitive damages against Rodenbach for his transgressions.

### THIRD CLAIM FOR RELIEF
### (BREACH OF FIDUCIARY DUTY UNDER THE CRAT)

117.    Lipman repeats the allegations in paragraphs 6-116 above as though fully set forth herein.

118.    This claim is pleaded in the alternative to Lipman's First Claim for Relief.

119.    Under the Antenuptial Agreement and the CRAT, Lipman was to begin receiving annuity payments as of December 31, 2017, the first quarterly due date after Plishner's death.

120.    Rodenbach refused to make payments on the annuity until Lipman vacated the Southampton Residence.  That was not a precondition to receiving payments under the Antenuptial Agreement and the CRAT, and indeed the failure to pay the annuity substantially impaired Lipman's ability to find new housing and to vacate her home.  By refusing to pay Lipman her annuity payments when due, Rodenbach breached his fiduciary duty and the terms of Article II, Section 2.5 of the Antenuptial Agreement and Article II, Section B.2 of the Trust.

121.    While Rodenbach did eventually commence making annuity payments to Lipman, none of the payments due through the date of this complaint was made on the due date.

122.    Lipman is entitled to an award of interest at the legal rate on account of the late payments on the annuity; an award of her reasonable attorney's fees pursuant to Article V, Section 5.17 of the Antenuptial Agreement; and an order requiring Rodenbach to make all future annuity payments by the dates due.

### FOURTH CLAIM FOR RELIEF
### (SECTION 487 OF THE JUDICIARY LAW)

123.    Lipman repeats the allegations in paragraphs 6-122 above as though fully set forth herein.

124.    At all relevant times after Plishner became disabled within the meaning of the Antenuptial Agreement, Rodenbach failed to disclose to Lipman that she was entitled to annuity payments from the First Disability Trust.

125.    Rodenbach's concealment of Lipman's entitlement under the First Disability Trust constituted a deceit within the meaning of Section 487 of New York's Judiciary Law.

126.    Pursuant to that statute, Lipman is entitled an award of treble damages from Rodenbach on account of his breach of the statute.

**FIFTH CLAIM FOR RELIEF**
**(BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING)**

127.    Lipman repeats the allegations in paragraphs 6-126 above as though fully set forth herein.

128.    The Antenuptial Agreement was entered into in New York, and by its terms "shall be governed and construed under the laws of the State of New York."  The various relevant trusts are governed by their terms by Connecticut law.

129.    Under New York and Connecticut law, every contract shall be construed as containing an implied covenant of good faith and fair dealing.

130.    By his conduct, and that of his agents, described above, Rodenbach has breached the covenant of good faith and fair dealing implied in the applicable agreements.

131.    Plaintiff is entitled to an award of damages for Rodenbach's breaches.

**SIXTH CLAIM FOR RELIEF**
**(DECLARATORY JUDGMENT AS TO THE VALIDITY OF THE CRAT)**

132.    Lipman repeats the allegations in paragraphs 6-131 above as though fully set forth herein.

133.    The annuity obligations in the Antenuptial Agreement were effectuated through charitable remainder trusts solely to reduce estate taxes.  Under the federal law applicable at the time of Plishner's death, there were no taxes due on his Estate.  Therefore, the stated purpose of the trusts cannot be fulfilled.

134.    In a conversation with Rodenbach in the summer of 2018, Carling told him that he had been advised by eminent New York trusts and estates counsel that the CRAT was invalid, as alleged in paragraph 20 above, because it did not set forth in its body the actuarial assumptions on which it would be funded.  Carling also informed Rodenbach that he had been advised that the correct course was simply to abandon the CRAT, and to purchase instead a commercial annuity for Lipman through the Living Trust.

135.    Rodenbach said he would not to do so, because that might put his firm in a bad light.  Rodenbach's elevating the reputational interest of his law firm over his duty to Lipman was a breach of his fiduciary duty to her.

136.    As alleged in paragraph 20 above, the Antenuptial Agreement required Rodenbach to establish trusts that conformed with the Internal Revenue Code and IRS regulations, but the CRAT fails to meet those applicable legal standards for a valid trust.

137.    Once Plishner became disabled within the meaning of the Antenuptial Agreement, Rodenbach was required to fund the First Disability Trust, and to commence annuity payments to Lipman.  When Plishner died in November 2017, Rodenbach was required to fund the Second Disability Trust, and to commence enhanced annuity payments to Lipman.

138.    As alleged in Lipman's First Claim for Relief, Rodenbach breached his fiduciary duty by failing to fund the Disability Trusts.

139.     Had Rodenbach funded the Disability Trusts as required, the CRAT would have been moot, and could have been disregarded.  Instead, to cover up his misconduct in ignoring the Disability Trusts, Rodenbach funded the CRAT.

140.     The amount transferred to the CRAT was some $2.2 million.

141.     Lipman is entitled to a declaratory judgment that (i) the CRAT is not a valid charitable remainder annuity trust under the applicable IRS regulations, and (ii) the CRAT should not have been funded in place of the Disability Trusts.

## SEVENTH CLAIM FOR RELIEF
### (FAILURE TO REIMBURSE)

142.     Lipman repeats the allegations in paragraphs 6-141 above as though fully set forth herein.

143.     At all relevant times prior to Lipman's purchase of the Southampton Residence, that home was the property of the Living Trust.

144.     The Living Trust was responsible for the expenses of the Southampton Residence, including homeowner's insurance.

145.      Rodenbach acknowledged in his November 28, 2017 letter that the Living Trust would pay the homeowner's insurance.

146.     In a subsequent letter, Rodenbach acknowledged that all the expenses of the Southampton Residence were the responsibility of the Living Trust.

147.     As alleged in paragraphs 99-100 above, when it was learned that Lipman had been paying the homeowners' insurance, Carling requested that the amounts she had paid be reimbursed, and Rodenbach refused to do so.

148.     At a subsequent date, Rodenbach offered to make the required reimbursement, but only in exchange for a general release, which would have required Lipman to waive the claims

asserted in this action.  The insurance reimbursement was an entitlement on Lipman's part, and would not have been fair consideration for a general release.  Thus, Lipman declined the offer.

149.    Lipman is entitled to an insurance reimbursement in the amount of $9,964, together with interest at the legal rate.

WHEREFORE, plaintiff prays for judgment as follows:

(a)    On her First Claim for Relief:

(i)    a finding, at trial, of the date on which Plishner became mentally impaired within the meaning of the Antenuptial Agreement;

(ii)    a judgment against Rodenbach personally for compensatory damages, at the rate of $104,000 per year from the date of Plishner's disability until the date of his death, together with interest at the legal rate;

(iii)    an award of punitive damages in an amount to be fixed by the jury;

(iv)    an order barring Rodenbach from charging any damages awarded and any of his attorney's fees to any of the Plishner trusts; and

(v)    an order removing Rodenbach as trustee of all of the Plishner trusts and as co-executor of Plishner's Estate, and appointing in his place a fiduciary selected by the Court who will protect Lipman's interests.

(b)    On her Second Claim for Relief, for such compensatory and punitive damages as may be awarded by the jury, in an amount not less than $2,500,000, together with attorney's fees as found by the jury or the Court.

(c)    On her Third Claim for Relief, for interest as may be awarded by the jury on the annuity payments that were made after their due dates.

(d)     On her Fourth Claim for Relief, for treble Lipman's damages as may be awarded by the jury.

(e)     On her Fifth Claim for Relief, for such compensatory damages as may be awarded by the jury.

(f)     On her Sixth Claim for Relief, for a declaratory judgment as to the legal validity of the CRAT, and on the lawfulness of defendant's funding the CRAT with moneys that should have been used to fund the Disability Trusts.

(g)     On her Seventh Claim for Relief, for $9,964, together with interest at the legal rate.

### Jury Trial Demand

Plaintiff hereby demands a trial by jury of all claims and issues triable as of right to a jury.

Dated:  New York, New York
        February 22, 2019

FRANCIS CARLING

(FC 1016)
174 East 74th Street, Suite 12BC
New York, NY 10021-3533
(917) 951-1237
fcarling@gmail.com

Attorney for Plaintiff

37