UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
NATALIE F. LIPMAN,

                                **MEMORANDUM & ORDER**

               Plaintiff,            19-CV-01073 (DRH)(AYS)

     -against-

EDWARD F. RODENBACH, CUMMINGS &
LOCKWOOD LLC, AND JANE M. BARBER,

                    Defendants.
-------------------------------------------------------------------X

**APPEARANCES:**

**For Plaintiff:**

Francis Carling Law Office
174 East 74th Street, Suite 12BC
New York, NY 10021-3533
By:    Francis Carling, Esq.

**For Defendant Jane Barber:**

Cullen and Dykman LLP
100 Quentin Roosevelt Blvd.
Garden City, NY 11530
By:    Elizabeth Usinger, Esq.

**For Defendants Edward F. Rodenbach and Cummings & Lockwood LLC:**
Cummings & Lockwood LLC
Six Landmark Square
Stamford, CT 06901
By:    Michael P. Kaelin, Esq.

**HURLEY, Senior District Judge:**

       Plaintiff Natalie F. Lipman ("Plaintiff" or "Lipman") brought this action against

Defendants Edward F. Rodenbach ("Rodenbach"), Cummings & Lockwood LLC ("Cummings

& Lockwood"), and Jane M. Barber ("Barber") (collectively, "Defendants").  Plaintiff's action is

for breach of fiduciary duty, intentional infliction of emotional distress, violation of Section 784

of the Judiciary Law, legal malpractice, declaratory judgment as to the validity of a trust, and for moneys due.  Plaintiff seeks compensatory and punitive damages and declaratory relief. Presently before the Court is Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 12(b)(7).  For the reasons set forth below, the motion is granted.

## BACKGROUND

The following allegations are taken from the Second Amended Complaint ("SAC")[1] and assumed true for purposes of this motion, unless otherwise noted.

## I.    The Parties

This action arises out of what is clearly an acrimonious relationship between Plaintiff, her daughter-in-law, and her late husband's attorney.  More specifically, this action is based on four trusts benefiting Plaintiff created by her now deceased husband, Paul J. Plishner ("Plishner"). (SAC ¶¶ 2-3.)  Plaintiff and Plishner "entered into a committed romantic relationship" in 1975 and resided together continuously from 1987 until Plishner's death on November 22, 2017.  (*Id.* ¶ 9.)  The couple married in August 2007, over the objection of Plishner's daughter, Defendant Barber, and Plishner planned his estate to provide for Plaintiff in the event he became disabled or predeceased her.

Barber is a co-trustee of four trusts benefitting Plaintiff along with Defendant Rodenbach, who was Plishner's lawyer "[a]t all relevant times."  (*Id.* ¶¶ 3, 11, 12, 22.)  He is a partner or principal in the law firm of Cummings & Lockwood LLC in Greenwich, Connecticut.  (*Id.* ¶ 3.)

---

[1] Defendants moved to dismiss Plaintiff's Amended Complaint [ECF No. 37]; however, Plaintiff filed a further amended complaint at the Court's direction for purposes of establishing diversity jurisdiction after Defendants served their motion to dismiss.  The Court therefore refers herein to the Second Amended Complaint rather than the earlier Amended Complaint.

II.    **The Living Trust**

Plaintiff alleges that in 1994, "Rodenbach entered into an arrangement with Barber… whereby they would jointly secure control of Plishner's finances for their mutual benefit."  (*Id*. ¶ 11.)  At their "urging," Plishner established the Paul J. Plishner Revocable Trust ("the Living Trust") and transferred "most, or substantially all, of his assets" to it.  (*Id*. ¶ 12.)  Plishner, Rodenbach, and Barber were the trustees of the Living Trust, of which Lipman is a beneficiary.  (*Id*. ¶¶ 12, 14.)  Rodenbach acted as Plishner's lawyer for this transaction, however Plaintiff alleges that "in fact he was fulfilling the arrangement he had made with Barber."  (*Id*. ¶ 13.)

The Living Trust provided funds for Plishner and Plaintiff's living expenses in their homes in New York City and Southampton.  (*Id*. ¶ 15.)  The New York City residence was a co-op apartment at 2 Fifth Avenue in Manhattan, owned by Plaintiff, and the Southampton residence was a house at 42 Foster Crossing, owned by Plishner (the "Southampton Residence").  (*Id*.)  In 2006, Plaintiff and Plishner stopped residing in the New York City apartment and began living full time at the Southampton Residence.  (*Id*. ¶ 16.)  Plishner provided expenses for the New York City apartment through the Living Trust "partly because he lived there from time to time, and partly in consideration of the fact that…he had retained a remainder interest in that apartment in an antenuptial agreement between Plishner and Lipman."  (*Id*.)

III.   **The Antenuptial Agreement**

As noted above, Lipman and Plishner married on August 25, 2007.  (*Id*. ¶ 19.)  In part to appease Barber, who opposed the marriage, "and on the advice of Rodenbach, Plishner insisted as a condition of their marriage that Lipman enter into an antenuptial agreement ('the Antenuptial Agreement')."  (*Id*. ¶ 18.)  As a result, before they wed, Lipman and Plishner executed the Antenuptial Agreement.  (*Id*.)

"Under the terms of the Antenuptial Agreement, Plishner and Lipman each retained exclusive ownership of their separate property, which was described in schedules attached to the Agreement; Lipman waived her right of election against Plishner's Will under New York law; and Plishner provided for a lifetime annuity to Lipman under certain conditions." (*Id*. ¶ 20.) Plaintiff summarizes the lifetime annuity provisions as follows:

(a)      Under Section 2.3 of the Agreement, in the event of Plishner's "disability" (which was defined to mean a "mental impairment" determined jointly by two named physicians), Lipman was to receive an annuity of $104,000 per year until Plishner's death (if he predeceased her).  At his death, the annuity was to be increased to $150,000 per year.

(b)      If Plishner did not become disabled, and predeceased Lipman, she was to receive a lifetime annuity of $150,000 per year.  Both annuities were to be paid "from a charitable remainder annuity trust established under Section 664(d)(1) of the Internal Revenue Code."

(*Id*.)

Though Rodenbach and Barber were not parties to the Antenuptual Agreement, Plishner directed them to enforce its terms through his Will and an amendment to the Living Trust.  (*Id*. ¶¶ 30-31.)

## IV.    The Charitable Remainder Annuity and Disability Trusts

In fulfillment of the terms of the Antenuptial Agreement, on September 7, 2007, Plishner executed three trusts for Lipman's benefit: the "Plishner Testamentary Charitable Remainder Annuity Trust f/b/o Natalie F. Lipman" (the "CRAT"), the "Plishner Disability Charitable Remainder Annuity Trust For Natalie F. Lipman," (the "First Disability Trust") and the "Plishner

Supplemental Charitable Remainder Annuity Trust f/b/o Natalie F. Lipman" (the "Second

Disability Trust").  (*Id.* ¶ 22.)  The First and Second Disability Trusts were to take effect if

Plishner became disabled, as defined in the Antenuptual Agreement.  (*Id.*)  Rodenbach prepared

all three trusts, and he and Barber were named as co-trustees of each trust.  (*Id.*) Though the

trusts were established for Lipman's benefit, "she was not provided a copy of the documents by

Rodenbach or Barber at the time they were executed, nor did Rodenbach or Barber inform her of

the trusts' terms."  (*Id.* ¶ 26.)

## V.    Plishner's Disability

In 1987, Plishner suffered a stroke, which left him with "some continuing neurological

deficit."  (*Id.* ¶ 34.)  Between 2007 and his death in 2017, "Plishner suffered progressive mental

impairment," which allegedly served as the catalyst for adding the disability clause to the

Antenuptual Agreement.  (*Id.* ¶ 35.)  Plaintiff alleges that Plishner added the disability clause

because he "did not trust Rodenbach and Barber to take care of Lipman financially if he became

mentally impaired."  (*Id.* ¶ 36.)

As noted above, Plishner was to be declared disabled if two physicians named in the

Antenuptual Agreement determined that he was disabled.  Those two physicians were Dr. Jeffrey

Nelson, a neurologist, and Dr. Howard H. Kloth, a cardiologist and internist, who treated

Plishner within their respective specialties.  (*Id.* ¶¶ 38, 39).  Dr. Nelson diagnosed Plishner as

suffering from progressive supranuclear palsy.  (*Id.* ¶ 38.)  Although Dr. Kloth did not diagnose

or treat Plishner for any mental impairment, "he would have deferred to Plishner's neurologists"

if asked to provide an opinion about Plishner's mental status.  (*Id.* ¶ 39.)  Both physicians retired

before Plishner passed away—Dr. Nelson retired prior to the execution of the Antenuptual

Agreement in 2007 and Dr. Kloth retired in 2011.  (*Id.* ¶¶ 38-39.)

In addition to Dr. Nelson, Plishner was also under the care of two additional neurologists: Dr. Govindan Gopinathan and Dr. Henry G. Moreta.  (*Id*. ¶¶ 41, 42.)  Dr. Gopinathan treated Plishner for many years and "concluded that Plishner suffered from Lewy body dementia."  (*Id*. ¶ 41.)  Lewy body dementia is a "neurological disease characterized by gradual and progressive loss of intellectual abilities combined with a movement disorder that resembles Parkinson's disease."  (*Id*. ¶ 43.)  Dr. Moreta initially diagnosed Plishner with "Parkinson's disease/parkinsonism," but later diagnosed him as suffering from Alzheimer's disease or Lewy body dementia.  (*Id*. ¶ 42.)  Neither Dr. Gopinathan or Dr. Moreta were named in the Antenuptial Agreement.  (*Id*. ¶ 40.)

On February 9, 2010, Plishner was admitted to the hospital on account of his dementia and diagnosed by Dr. Moreta as having Lewy body dementia.  (*Id*. ¶ 43.)  Plishner's mental impairment progressively worsened from that point until the date of his death.  (*Id*. ¶ 44.)  "At all relevant times, Rodenbach and Barber were aware that Plishner suffered from a progressive dementia, and that he was disabled thereby."  (*Id*. ¶ 45.)

Plaintiff alleges that Plishner's mental impairment was "manifest" between August 2007 and February 2010.  (*Id*. ¶ 47.)  As such, in Plaintiff's view, "it was incumbent upon [Rodenbach and Barber], as trustees of the Living Trust, and as Lipman's fiduciaries, to consult with the physicians named in the Antenuptial Agreement – and Plishner's other physicians, if necessary – and have it confirmed that the disability clause of that Agreement had been triggered."  (*Id*.)  Rodenbach and Barber did not do this, however, because, they allegedly did not want Plaintiff to receive the $104,000 annuity to which she would have become entitled if Plishner were declared disabled.  (*Id*. ¶ 48.)  Plaintiff maintains that once Plishner became disabled within the meaning

of the Antenuptual Agreement, "Rodenbach and Barber were obliged to fund the First Disability Trust" and that the CRAT became a nullity and should have been discarded.  (*Id*. ¶ 51.)

## VI.     The Dispute Over the Southampton Residence

In April 2013, Plaintiff retained Francis Carling as her attorney "to protect her interests in the event of her death or the death of her husband."  (*Id*. ¶ 55.)  Carling and Rodenbach spoke about Plaintiff's expectation, based on promises made by Plishner and Barber, to remain in the Southampton residence in the event of her husband's death.  (*Id*. ¶¶ 28, 33, 56.)  When Rodenbach suggested the Southampton house might be larger than what Plaintiff would need without her husband, Carling suggested that if Plishner died, the Living Trust could sell the Southampton Residence and purchase a smaller house in the village for Plaintiff.  (*Id*. ¶¶ 57-58.) The lawyers agreed to put off further discussion on this topic until necessary.  (*Id*. ¶ 59.)

Around the same time, Rodenbach and Barber allegedly "induced Plishner to transfer to Barber his farm in Roxbury, Connecticut, an asset valued in the Antenuptual Agreement at some $2 million."  (*Id*. ¶ 67.)  Plaintiff contends that Plishner was not mentally competent to approve the transfer, and that the effect was to "dramatically reduce the assets in the Living Trust, thus making it uncertain whether that Trust could fund the Disability Trusts or the CRAT without first selling the Southampton Residence."  (*Id*. ¶¶ 67-68.)

On November 22, 2017, Plishner passed away in his sleep at the Southampton Residence. (*Id*. ¶ 72.)  Plaintiff alleges that "Rodenbach and Barber immediately put into motion a plan to oust Lipman from her home, and to so terrorize and demoralize her," including by bypassing Carling and speaking to her directly.  (*Id*. ¶¶ 73-74.)  On November 28, 2017, Rodenbach sent Plaintiff a letter stating, in relevant part, that: 1) he was terminating all payments for her upkeep and support effective January 1, 2018; 2) Lipman might not receive her annuity of $150,000 until

Plishner's estate had been settled, which he estimated would take at least two years; 3) instructing Plaintiff to relocate to her apartment in New York City as soon as possible; 4) instructing Plaintiff to leave Plishner's furniture in the Southampton residence.  (*Id*. ¶ 75.) Plaintiff alleges that this letter, sent so soon after the death of her husband, "had a devastating effect on [her] health and emotional well-being."  (*Id*. ¶ 76.)

After some back and forth between Carling and Rodenbach about the Southampton Residence, Carling suggested that Plaintiff be permitted to remain in the house for another five years, rather than her lifetime as initially promised, and that she would begin paying all expenses for the house effective January 1, 2018.  (*Id*. ¶ 90.)  Rodenbach rejected the proposal on March 7, 2018 and made no counterproposal.  (*Id*. ¶ 92.)  Between December 14, 2017 and March 7, 2018, Rodenbach and his partner Daniel P. Fitzgerald ("Fitzgerald") "continued to exert pressure on Lipman by making…false claims and threats," such as that she would not receive annuity payments until she vacated the Southampton Residence, that she had breached the Antenuptual Agreement by remaining in the Southampton Residence after Plishner's death, and that they would commence eviction proceedings against her.  (*Id*. ¶¶ 94-96.)

"Carling then notified Rodenbach that Lipman would attempt to raise the necessary funds so that she could purchase the Southampton Residence herself, thus resolving what were then thought to be the issues between the parties."  (*Id*. ¶ 109.)  The annuity payments became a chicken-and-egg problem in this regard, with Rodenbach justifying withholding the annuity payments because Lipman was in breach of her obligations by not vacating the Southampton Residence, and Lipman unable to purchase the house without the money from the annuity payments.  (*Id*. ¶¶ 110-11.)  On April 9, 2018, Rodenbach informed Carling that "a New York lawyer had been retained to commence eviction proceedings against Lipman."  (*Id*. ¶ 114.)

Rodenbach ultimately said Lipman could not remain in the Southampton Residence because the CRAT, which he represented was the source of the annuity payments, could not be funded by transfer of the Southampton Residence, but had to be funded in cash or marketable securities. (*Id*. ¶ 120.)  Because there were not enough liquid assets in the Living Trust to fund the CRAT, Rodenbach said that he was required by law to sell the Southampton Residence.  (*Id*. ¶ 121.)  He also asserted that, once the CRAT was funded, Lipman would not be able to remain in the Southampton Residence because doing so would violate rules against self-dealing.  (*Id*. ¶ 122.)

**VII.    The Barber Action**

In light of the dispute over the Southampton Residence, Plaintiff filed an action in this district on April 23, 2018 against Barber (*Lipman v. Barber*, 18-cv-2390(ADS)(GRB)) "to protect her rights, and to block the effort to evict her from her home" (the "Barber Action").  (*Id*. ¶ 128.)  "Barber was chosen as the defendant because Rodenbach had implied to Carling that she was the driving force behind his actions."  (*Id*.  ¶¶ 127-28.)  Rodenbach was not named as a defendant in that action.

On June 27, 2018, the parties appeared before Judge Brown for an initial conference, which turned into a settlement conference.  (*Id*. ¶ 137.)  The parties reached a settlement at that conference: Barber agreed to sell the Southampton Residence to Plaintiff for $2.3 million and Plaintiff agreed to drop her claims.  (*Id*. ¶ 138.)  Lipman entered into a contract of sale with the Living Trust, requiring Lipman to pay a deposit of $230,000 and to close on or before October 1, 2018.  (*Id*. ¶ 142.)  Lipman faced difficulty obtaining a mortgage "while she was not receiving her annuity, which was meant to be the major portion of her income."  (*Id*. ¶ 143.)  Rodenbach eventually agreed to start making payments on the annuity and the parties agreed to extend the closing date to November 1.  (*Id*.)  Because Lipman was still unable to obtain a mortgage, the

Living Trust agreed to a further extension of the closing date but demanded that Plaintiff "pay it $300 per each day after November 1st before the closing occurred." (*Id*. ¶ 145.)  The sale finally closed on November 19, 2018 and Plaintiff was required to pay the Living Trust $5,700 in "per diem rent." (*Id*. ¶¶ 146-47.)

After the Barber action settled but before the closing on the Southampton Residence, Carling "discovered" that Plaintiff had been making all payments on the homeowner's insurance policy, despite Rodenbach's earlier confirmation that Plishner's estate (by which Plaintiff assumes he may have meant the Living Trust) "would pay 'insurance on the house but only for the contents owned by [Plishner].'" (*Id*. ¶ 149.)  Carling asked Rodenbach to reimburse Plaintiff for the insurance expenses.  Eventually, Carling suggested that the closing payments be adjusted to give Plaintiff credit for the insurance payments she had made.  (*Id*. ¶ 151.)  "Rodenbach, through his counsel, then declared on November 14, 2018 that 'the settlement agreement [in the Barber action] did not involve the Trust.'" (*Id*. ¶ 152.)  However, "[a]t one point," Rodenbach offered to make the required reimbursement in exchange for a "general release, which would have required Plaintiff to waive the claims asserted in this action." (*Id*. ¶ 230.)  This general release comment prompted Plaintiff's attorney to perform a more comprehensive investigation, leading him to believe that Plaintiff was entitled to an annuity under the Disability Trusts, and to therefore bring the present action.

## DISCUSSION

## I.   Legal Standards

### A.  Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1)

A case may properly be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) "when the district court lacks the statutory or constitutional power to adjudicate it."

*Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "In contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a 'plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'" *MacPherson v. State St. Bank & Trust Co.*, 452 F. Supp. 2d 133, 136 (E.D.N.Y. 2006) (quoting *Reserve Solutions Inc. v. Vernaglia*, 438 F. Supp. 2d 280, 286 (S.D.N.Y. 2006)), *aff'd*, 273 F. App'x 61 (2d Cir. 2008); *accord Tomaino v. United States*, 2010 WL 1005896, at *1 (E.D.N.Y. Mar. 16, 2010).  "In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court may consider affidavits and other materials beyond the pleadings to resolve jurisdictional questions." *Cunningham v. Bank of New York Mellon, N.A.*, 2015 WL 4101839, * 1 (E.D.N.Y. July 8, 2015) (citing *Morrison v. Nat'l Australia Bank, Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)).

### B.  Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action, a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber v. Metro. Life Ins. Co*., 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  The plausibility standard is guided by two principles. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *accord Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009).

First, the principle that a court must accept all allegations as true is inapplicable to legal conclusions.  Thus, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice."  *Iqbal,* 556 U.S. at 678.  Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679.  A plaintiff must provide facts sufficient to allow each named defendant to have a fair

understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.  *See Twombly*, 550 U.S. at 555.

Second, only complaints that state a "plausible claim for relief" can survive a motion to dismiss.  *Iqbal*, 556 U.S. at 679.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that defendant acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line' between possibility and plausibility of 'entitlement to relief.'"  *Id*. at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted); *see In re Elevator Antitrust Litig*., 502 F.3d 47, 50 (2d Cir. 2007).  Determining whether a complaint plausibly states a claim for relief is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679; *accord Harris*, 572 F.3d at 72.

### C.  Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(7)

Under Rule 12(b)(7), an action must be dismissed for failure to join a party under Rule 19 if the absent party is (1) necessary but joinder is not feasible, and (2) indispensable to the action.  *See Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724-25 (2d Cir. 2000); *Washington v. City of New York*, 2019 WL 2120524, * 11 (S.D.N.Y. Apr. 30, 2019) ("Courts apply a two-part test to determine whether an action must be dismissed for failure to join an indispensable party.  First, the court must determine whether an absent party belongs in the suit, i.e., whether the party qualifies as a 'necessary' party under Rule 19(a).  If a party does not qualify as necessary under Rule 19(a), the Court does not need to make any further decision with respect to the motion to dismiss.  If a party does qualify as necessary, the Court looks to whether it is feasible to join that

party; if it is not feasible to join the necessary party, the Court determines whether the party is

indispensable.") (internal quotation marks and citation omitted).  In determining a Rule 12(b)(7)

motion, a court may accept all factual allegations in the complaint as true and draw inferences in

favor of the plaintiff.  *Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 354

(2d Cir. 2015).

## II.      Consideration of Materials Outside the Complaint

Preliminarily, the Court must determine what materials "outside" the Complaint it may

properly consider on the Rule 12(b)(6) motion.

Defendant has submitted documents from the Barber action, in particular 1) the Barber

complaint; 2) the transcript of the settlement conference before Judge Brown; and 3) the

stipulation of dismissal with prejudice.  Because these documents are integral to the complaint

and are matters of which judicial notice may be taken, the Court may properly consider these

documents for the purposes of this motion.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147,

152-53 (2d Cir. 2002).

## III.     Defendants Have Not Shown that Plishner is a Necessary Party

Defendants argue that the action should be dismissed because Plaintiff failed to join a

necessary party, i.e. Plishner's estate, and that such joinder would destroy diversity jurisdiction

and deprive this Court of jurisdiction.  Because this goes to the Court's subject matter

jurisdiction over this case, the Court addresses this issue first.

First, the Court must determine whether Plishner's estate is a necessary party that must be

joined pursuant to Fed. R. Civ. P. 19(a).  Rule 19(a) provides that a party is necessary and must

be joined if:

> (1) in the person's absence complete relief cannot be accorded among those
> already parties, or (2) the person claims an interest relating to the subject of the

action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a).  Defendants, as the movants, bear the burden of showing that joinder is appropriate.  *Greenwich Life Settlements, Inc. v. ViaSource Funding Grp., LLC*, 742 F. Supp. 2d 446, 455 (S.D.N.Y. 2010).  Defendants argue that the estate is necessary because "all claims for relief in this action are based upon the Antenuptual Agreement between Lipman and Plishner."  (Defs.' Mem. in Supp. [ECF No. 41] at 11.)  Plaintiff argues that she is "*not* suing to enforce the Antenuptual Agreement or the Will; she is suing her trustees for ignoring the instructions of the settlor of the Living Trust and the First Disability Trust (to her detriment as beneficiary)…"  (Pl.'s Mem. in Opp. [ECF No. 43] at 17) (emphasis in original).  Defendants do no more than assert in a conclusory fashion that Plishner's estate is necessary, without explaining why or providing any case law in support of their proposition.  Furthermore, it is clear from Plaintiff's papers that her complaints are not against late her husband or his estate but specifically against Rodenbach and Barber.  Thus, the Court finds that Defendants have not met their burden to establish that Plishner's estate is necessary, and Defendants' motion to dismiss on that basis is denied.

## IV.    Plaintiff's Claims are Barred by Res Judicata

Defendants argue that the claims asserted in this action are barred by res judicata because similar claims were litigated in the Barber action and dismissed with prejudice.  (Defs.' Mem. in Supp. at 7-11.)  Plaintiff argues that the settlement of the Barber action does not preclude the claims here because they are based on a different trust than the one at issue in the Barber action and because this action is brought against different parties.  (Pl.'s Mem. in Opp. at 12-18.)

Res judicata provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). As the Second Circuit explained in *Marcel Fashions Group, Inc. v. Lucky Brand Dungarees, Inc.,* 779 F.3d 102 (2d Cir. 2015):

> The term res judicata, which means essentially that the matter in the controversy has already been adjudicated, encompasses two significantly different doctrines: claim preclusion and issue preclusion. Under claim preclusion, a final judgment forecloses successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit. The doctrine precludes not only litigation of claims raised and adjudicated in a prior litigation between the parties (and their privies), but also of claims that might have been raised in the prior litigation but were not. The doctrine of issue preclusion, in contrast, bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim.

*Marcel,* 779 F.3d at 107 (citations and internal quotation marks omitted).

Res judicata applies where: "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 285 (2d Cir. 2000) (citation omitted).

In sum, under the res judicata doctrine, "'once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if [the claims are] based upon different theories'" or asserted against new parties in privity to the parties in the prior litigation. *See Sosa v. JP Morgan Chase Bank,* 33 A.D.3d 609, 611, 822 N.Y.S.2d 122 (2d Dept. 2006) (quoting *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981)); *see Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) ("Under both New York and federal law, the doctrine of res judicata, or claim preclusion, provides that a final judgment on

the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.") (internal quotation marks omitted); *Houdet v. U.S. Tennis Ass'n*, 2014 WL 6804109, at *4 (E.D.N.Y. Dec. 3, 2014) (finding res judicata applies "not just to the parties in a prior litigation but also to those in privity with them" where the "new defendants have a sufficiently close relationship to justify [its] application").

New York "has adopted a transactional approach to res judicata, barring a later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (citing *Smith v. Russell Sage Coll.*, 54 N.Y.2d 185 (1981)).

### A. Adjudication on the Merits

Defendants contend that the first action involved an adjudication on the merits in the form of a stipulated settlement dismissing the action with prejudice.  (Defs.' Mem. in Supp. at 7.)  Plaintiff does not actually dispute that a dismissal with prejudice pursuant to a settlement agreement can serve as an adjudication on the merits, but seems to argue that the settlement reached in the Barber action does not serve as a basis for res judicata in this action because the Barber settlement involved different claims against different parties.  (Pl.'s Mem. in Opp. at 12-13.)  Plaintiff also argues that the settlement in the Barber action "did not (unlike a judgment after trial) entail any findings of fact as to the merits of her claim or the truth of the allegations in her pleading."  (*Id*. at 19.)

"A dismissal with prejudice has the effect of a final adjudication on the merits favorable to the defendant….Such a dismissal constitutes a final judgment with the preclusive effect of *res judicata* not only as to all matters litigated and decided by it, but as to all relevant issues which could have been but were not raised and litigated in the suit." *Nemaizer v. Baker*, 793 F.2d 58,

60-61 (2d Cir. 1986) (internal quotations and citations omitted); *Kimso Apartments LLC v. Dish Network Servs. LLC*, 2017 WL 8780452, at *8 (E.D.N.Y. Dec. 20, 2017) (finding stipulation of dismissal with prejudice is an adjudication on the merits).

Plaintiff's arguments that the settlement in the Barber action does not bar the present action are without merit.  Her argument that the Barber action involved different claims against different parties fails for reasons that will be discussed in further detail below.  As to her contention that the settlement in the Barber action did not entail findings of fact, and is therefore not entitled to preclusive effect, Plaintiff does not cite any case law in support of this proposition.  Rather, as noted above, the case law clearly states that a dismissal with prejudice pursuant to a settlement agreement constitutes an adjudication on the merits.  Indeed, Judge Brown stated at the settlement conference in the Barber action: "And this sale of the house will resolve all claims, all counterclaims, everything incorporated in this case.  There will be no more suing, there will be no more claims, there will be no more litigation."  (Usinger Decl. Ex. C (Settlement Conf. Tr.) [ECF 40-3] at 3:21-25.)  Thus, the stipulation of dismissal that resulted from the settlement between the parties in the Barber action constitutes an adjudication on the merits and the first prong of the res judicata analysis is met.

**B.  Privity**

Defendants assert that the privity prong is satisfied because "Lipman I involved the same parties and those in privity with them—Rodenbach in privity with Barber—as Lipman II." (Defs.' Mem. in Supp. at 7.)  Plaintiff argues that Defendants' claims of privity are based on "assertions that are either misleading or simply false."  (Pl.'s Mem. in Opp. at 13.)  For example, with respect to the relationship between Barber and Rodenbach, Plaintiff asserts that

Rodenbach's consent, as a trustee of the Living Trust, to the sale of the Southampton home to effectuate the settlement in the Barber action was "limited to the sale itself." (*Id*.)

"Under New York and federal law…concepts summarized by the term privity are looked to as means of determining whether the interests of the party against whom claim preclusion is asserted were represented in prior litigation." *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995). Privity "includes those who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and possibly coparties to a prior action." *Ruiz v. Comm'r of Dept. or Transp.*, 858 F.2d 898, 903 (2d Cir. 1988) (internal citations and quotations omitted).

The Barber action was brought solely against Barber, while the instant action is against Rodenbach, Cummings & Lockwood, and Barber. The focus of this action is undoubtedly Rodenbach, with only one claim each against Barber and Cummings & Lockwood. Rodenbach is not new to this sequence of events, though. His name appears frequently in the Barber complaint, with references to his involvement in Plishner's estate planning, both as Plishner's lawyer and as Barber's co-trustee on the various trust instruments Rodenbach drafted on Plishner's behalf. (Usinger Decl. Ex. A (Barber Compl.) [Ex. 40-1].) Furthermore, the transcript of the settlement conference before Judge Brown reveals that Barber's attorney, Elizabeth Usinger, was in communication with Rodenbach during the course of the settlement negotiations for the Barber action, and Judge Brown even sought Rodenbach's approval for the sale of the Southampton house in his role as co-trustee. (Usinger Decl. Ex. C at 7:5-14.) And Plaintiff admits that the reason she brought the first action against Barber instead of Rodenbach is because "Rodenbach had implied to Carling that [Barber] was the driving force behind his actions." (SAC ¶¶ 127-28.)

Nonetheless, Plaintiff argues that Rodenbach's role in the Barber action was limited to approving the sale of the Southampton Residence, however both the Barber complaint and the complaint in this action make clear that Rodenbach played a leading role in the actions Plaintiff complains of.  Plaintiff admits that she claimed that Rodenbach was Barber's agent in the first action and that, in both actions, "virtually all the acts complained of were actions taken by Rodenbach."  (Pl.'s Mem. in Opp. at 20.)  Plaintiff makes this admission in correcting Defendants' statement that Barber acted as Rodenbach's agent, however which way the relationship flowed is not relevant to the inquiry of whether privity existed.  Either way, both parties have similar interests in the outcome of this and the Barber proceedings as co-trustees of the applicable trusts.  And Plaintiff alleges that the actions taken against her were part of a plan concocted by both Rodenbach and Barber.  (SAC ¶ 11 ("Rodenbach entered into an arrangement with Barber… whereby they would jointly secure control of Plishner's finances for their mutual benefit."))  Therefore, the Court concludes that Rodenbach was in privity with Barber for purposes of the res judicata analysis.

 The sole claim against Cummings & Lockwood is for joint and several liability for any damages against Rodenbach because his "actions and failures to act…were taken in his capacity as a partner of Cummings & Lockwood."  (SAC ¶ 210.)  Because the Court finds that privity exists between Rodenbach and Barber, and because the claim against Cummings & Lockwood is based entirely on its role as Rodenbach's employer, the claim against Cummings & Lockwood could also have been brought in the Barber action.

### C.  Same Claims or Claims that Could Have Been Raised in Previous Action

Defendants argue that Lipman's claims in this action arise out of the same set of facts as the Barber action.  (Defs.' Mem. in Supp. at 8.)  In Defendants' view, there are only two main

differences between this action and the Barber action: "(i) the [Cummings & Lockwood]

Defendants are not named as defendants in [the Barber action] (though the same allegations of

wrongdoing are made against Rodenbach in both complaints); and (ii) in [the Barber action],

Lipman alleges that Barber and Rodenbach had a duty to fund the CRAT and begin making

annuity payments to Lipman in accordance with the Antenuptual Agreement when Plishner died,

whereas in [this action], Lipman alleges that Barber and Rodenbach had a duty to fund the

CRAT and begin making annuity payments to Lipman when Plishner became disabled before he

died." (*Id*. at 8-9.)  Because Lipman knew the facts relevant to this action during the Barber

action, Defendants argue that the claims asserted here "could have and should have" been

asserted earlier.  (*Id*. at 10.)

Plaintiff, in turn, contends that "the core of the new case – and the only claim brought

against Barber presently – is the claim that plaintiff should have been receiving disability annuity

payments for many years before her husband's death.  That claim could not have been brought in

the first action *because Rodenbach and Barber concealed it from her*."  (Pl.'s Mem. in Opp. at

21) (emphasis in original).

A comparison of the claims in each action is helpful to this analysis.  The Barber action

included claims against Barber for: 1) intentional infliction of emotional distress for her actions

from November 28, 2017 on; 2) breach of contract for refusal to pay annuity payments under the

Antenuptual Agreement; 3) breach of fiduciary duty under the Living Trust; 4) breach of the

covenant of good faith and fair dealing "implied in the applicable agreements" for her conduct

"and that of her agents;" 5) declaratory judgment as to disqualification of Barber as beneficiary

of the Living Trust for her breaches of the Living Trust as set forth in claims 2-4; 6) injunctive

relief enjoining eviction proceedings from the Southampton Residence; 7) declaratory judgment

that Plaintiff has the option to enforce the terms of the Antenuptual Agreement or revoke the Agreement and exercise her right of election under New York law; 8) declaratory judgment as to the validity of the CRAT.  (Usinger Decl. Ex. A.)

This action, by comparison, includes claims for: 1) breach of fiduciary duty under the Living Trust and the Disability Trusts against Rodenbach and Barber; 2) intentional infliction of emotional distress against Rodenbach for his actions from November 28, 2017 on; 3) breach of fiduciary duty under the CRAT against Rodenbach; 4) violation of Section 487 of the Judiciary Law against Rodenbach for concealment of Lipman's entitlement under the First Disability Trust; 5) legal malpractice against Rodenbach for breach of his duty of undivided loyalty to Plishner and Lipman; 6) joint and several liability against Cummings & Lockwood LLC for Rodenbach's actions; 7) declaratory judgment as to the validity of the CRAT against Rodenbach; and 8) failure to reimburse against Rodenbach for the insurance payments on the Southampton Residence.  (SAC.)

The claims, on their face, appear almost identical.  Further review of the substance of the claims confirms that impression.  The facts alleged in the SAC are clearly part of the same transaction of events that gave rise to the Barber action.  And even though Plaintiff contends she only became aware of the claims brought in this action after the Barber action had been settled, it is clear that she knew of the underlying facts well before that.

After the closing of the Southampton Residence, a dispute arose between Plaintiff and Rodenbach about a reimbursement for premiums Plaintiff had paid for homeowner's insurance, which Plaintiff argued should have been paid by the Living Trust.  (Pl.'s Mem. in Opp. at 10.) Rodenbach offered to make the reimbursement in exchange for a "general release (presumably, in favor of the individual defendants and the relevant trusts)."  (Pl.'s Mem. in Opp. at 10-11.)

"This demand caused plaintiff's counsel to re-visit the facts and circumstances of the case, to be sure that plaintiff had no other claims that might be foreclosed by such a release." (Pl.'s Mem. in Opp. at 11.)

Though Plaintiff says she was unaware of the terms of the Disability Trusts until after the settlement of the Barber action, it is evident that she was aware of their existence and general purpose long before that. The Disability Trusts were created "in fulfillment of the terms of the Antenuptual Agreement," an agreement that Plaintiff was a party to. (SAC ¶ 22.) In fact, Plaintiff's lawyer "inquired of Rodenbach why plaintiff had never received disability annuity payments in accordance with the Antenuptual Agreement" in March 2018, months before the settlement conference before Judge Brown or the stipulation of dismissal in the Barber action. (Pl.'s Mem. in Opp. at 10.) Rodenbach responded that the physicians named in the Antenuptual Agreement had never declared Plishner to be disabled. (Pl.'s Mem. in Opp. at 10.) "[O]n the assumption that an opinion rendered by the physicians had foreclosed any entitlement on plaintiff's part to a disability annuity, that issue was dropped by plaintiff's counsel, and was not raised in the Barber action." (Pl.'s Mem. in Supp. at 10.) Everything in Plaintiff's papers suggests that she and her attorney knew enough to conduct any requisite investigation into the disability annuity payments at the time of the Barber action but failed to do so. That failure does not overcome the res judicata bar. Thus, the claims brought in this action could have been brought in the Barber action and are now barred.

**CONCLUSION**

For the foregoing reasons, Defendants' Rule 12(b)(1), 12(b)(6), and 12(b)(7) motion to

dismiss is granted. The Clerk of Court is directed to enter judgment and close the case.

**SO ORDERED.**

Dated: Central Islip, New York      _s/ Denis R. Hurley_
       May 8, 2020              Denis R. Hurley
                                     United States District Judge